IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

GARY PACE                                                                                                   PLAINTIFF

V.                          Case No. 2:25-CV-00069-DPM-BBM

FRANK BISIGNANO, Commissioner,
Social Security Administration[1]                                                         DEFENDANT

## RECOMMENDED DISPOSITION

This Recommended Disposition ("Recommendation") has been sent to United States District Judge D.P. Marshall Jr. Either party may file written objections to this Recommendation. Those objections should be specific and should include the factual or legal basis for the objection. To be considered, objections must be received in the office of the Court Clerk within 14 days. If no objections are filed, Judge Marshall can adopt this Recommendation without independently reviewing the record. By not objecting, parties may also waive the right to appeal questions of fact.

### I.    INTRODUCTION

Gary Pace applied for Title II disability benefits on March 3, 2022, alleging disability beginning on August 14, 2020. (Tr. at 37). His claim was denied both initially and upon reconsideration, and he requested a hearing before an Administrative Law Judge ("ALJ"). *Id*. On May 14, 2024, the ALJ concluded that Pace was not disabled. (Tr. at 48). Pace requested review, which the Appeals Council denied on March 14, 2025. (Tr. at 1).

---

[1] On May 7, 2025, Frank Bisignano was sworn in as Commissioner of the Social Security Administration ("the Commissioner"). Pursuant to Federal Rule of Civil Procedure 25(d), Commissioner Bisignano is automatically substituted as the Defendant.

The ALJ's decision now stands as the final decision of the Commissioner, and Pace requests judicial review. For the reasons set forth below, this Court recommends that the decision of the Commissioner be affirmed.

## II. THE COMMISSIONER'S DECISION

At Step One of the sequential five-step analysis,[2] the ALJ found Pace had not engaged in substantial gainful activity since his alleged onset date of disability. (Tr. at 39). At Step Two, the ALJ found that Pace had the following severe impairments: diabetes mellitus, seizure disorder, headaches, and sleep apnea. *Id*. After finding at Step Three that none of these impairments or combination of impairments met or medically equaled a listed impairment, the ALJ determined that Pace had the residual functional capacity ("RFC") to perform light work with the following restrictions: (1) no climbing ladders, ropes, or scaffolds; (2) occasional climbing of ramps and stairs; (3) occasional stooping, crouching, kneeling, and crawling; (4) no concentrated exposure to excessive vibration; (5) no exposure to unprotected heights, open bodies of water, open flames, or hazardous machinery; (6) no work involving the use of motor vehicles or firearms; and (7) only occasional exposure to poorly ventilated areas, extreme temperatures, or irritants, such as fumes, odors, dust, and gases. (Tr. at 41–42).

---

[2] Using a five-step sequence, the ALJ determines: (1) whether the claimant was engaged in substantial gainful activity; (2) if not, whether the claimant had a severe impairment; (3) if so, whether the impairment (or combination of impairments) met or equaled a listed impairment; (4) if not, whether the impairment (or combination of impairments) prevented the claimant from performing past relevant work; and (5) if so, whether the impairment (or combination of impairments) prevented the claimant from performing any other jobs available in significant numbers in the national economy. 20 C.F.R. §§ 404.1520, 416.920(a)(4).

At Step Four, the ALJ found that Pace could perform his past relevant work as a food checker, cashier supervisor, and management trainee. (Tr. at 47). As such, the ALJ concluded that Pace was not disabled. (Tr. at 48).

## III.    DISCUSSION

### A.    Standard of Review

"In reviewing the ALJ's decision," the Court "examine[s] whether it is supported by substantial evidence on the record as a whole and whether the ALJ made any legal errors." *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); *see also* 42 U.S.C. § 405(g). "Substantial evidence is that which a 'reasonable mind might accept as adequate to support a conclusion,' whereas substantial evidence on the record as a whole entails 'a more scrutinizing analysis.'" *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (citations omitted). "Our review 'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . . [W]e also take into account whatever in the record fairly detracts from that decision.'" *Gann v. Berryhill*, 864 F.3d 947, 950-51 (8th Cir. 2017) (citation omitted). "Reversal is not warranted, however, 'merely because substantial evidence would have supported an opposite decision.'" *Reed*, 399 F.3d at 920 (citation omitted).

In clarifying the "substantial evidence" standard applicable to review of administrative decisions, the Supreme Court has explained: "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is 'more than a mere scintilla.'" *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It

3

means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citation omitted).

### B. Pace's Relevant Medical History

On August 14, 2020, Pace sought treatment at the Forrest City Medical Center emergency department following a seizure that occurred at his home in the presence of a family member. (Tr. at 333). In the ambulance on the way to the hospital, Pace had a second seizure. (Tr. at 383). He had no history of seizures. (Tr. at 333). Results from a CT scan indicated that Pace had a "[s]mall 7mm ill-defined hypodensity" within the high left parietal lobe that "could represent an area of subacute to chronic ischemia." (Tr. at 338). Pace was transferred to Baptist Health Medical Center in North Little Rock, Arkansas, for further treatment. (Tr. at 379). The following day, an MRI showed no acute or chronic changes in the left parietal areas "as alluded to on CT." (Tr. at 392). Because Pace had been seizure-free for more than 24 hours, and his MRI and EEG were unremarkable, he was discharged on August 16, 2020, in stable condition and advised to follow-up with the VA. (Tr. at 393–94).

On November 2, 2020, Pace was seen at Baptist Health Medical Center following another seizure incident he had earlier that day witnessed by a family member. (Tr. at 357). Pace had two seizures while at home and a third witnessed by the nurse in the emergency room. (Tr. at 360–61). He was postictal for two hours. (Tr. at 363). Results from a CT scan were unremarkable, with no acute intracranial findings. (Tr. at 467–68).

On January 26, 2021, Pace had a neurology consult with Dr. Sarkis Nazarian. (Tr. at 564–65). Notes indicate that an MRI showed "[s]ubtle, equivocal FLAIR hyperintense

4

signal within the posterior left mesial temporal lobe without enhancement. This may represent sequela of recent seizure activity. Correlate with the clinical symptomatology." (Tr. at 565). Pace was prescribed lamotrigine, and it was recommended that he ask his primary care physician (PCP) about a sleep study. *Id*. Notes from his follow-up in November 2021 reveal that Pace had not had a seizure since November 2020. (Tr. at 549).

Another CT scan done on January 5, 2022, showed no acute intracranial pathology. (Tr. at 450). On August 1, 2022, Pace reported that he was having episodes of staring into space, but medical notes indicate that these "staring episodes are not alarming for seizures with immediate responding once called." (Tr. at 654).

On March 6, 2023, at a neurology follow-up, Pace reported two instances that occurred two to three weeks earlier where he suddenly started shaking in all four extremities that lasted for a few seconds. (Tr. at 843). Pace also continued to report staring episodes lasting for up to a minute and stated that these episodes were happening about once a week. (Tr. at 846). On March 14, 2023, Pace had an MRI that revealed "minor" abnormalities, including the following impressions: (1) stable slight asymmetric FLAIR signal in the mesial temporal lobes, without significant change, progression, sclerosis, atrophy or abnormal enhancement as previously; (2) stable minimal periventricular T2/FLAIR spotty white matter signal foci; (3) no additional new or significant intracranial abnormality; (4) stable developmental mild cerebellar tonsillar ectopia, without tonsillar herniation or mass effect at the foramen magnum; and (5) mild ethmoid and sphenoid sinus mucosal disease "is minimally more prominent." (Tr. at 823–24).

On June 21, 2023, Dr. Bashir Shihabuddin, Chief of Neurology at the VA in Little

Rock, wrote a letter on Pace's behalf, stating that Pace had been diagnosed with "intractable focal epilepsy with secondary generalizations." (Tr. at 900). Despite taking lamotrigine 200 mg twice a day and levetiracetam 250 mg daily, Pace continued to report nocturnal seizures witnessed by his partner, the last one two weeks prior. *Id*. Dr. Shihabuddin noted that, although Pace has had normal EEGs in the past, a 2023 MRI showed "abnormal slight asymmetric FLAIR signal in the mesial temporal lobes" that had been stable since 2020 when Pace was diagnosed with epilepsy. *Id*. Dr. Shihabuddin stated that Pace was "advised to observe seizure safety precautions including not to operate motorized vehicles (aware of AR law regarding seizures and driving), heavy machinery, avoiding heights, bodies of water and any situation that risks injury for himself or others in case he experiences a seizure." *Id*. Dr. Shihabuddin concluded that "[s]econdary to his epilepsy and associated safety precautions [Pace] is currently incapable of gainful employment." *Id*.

Pace again sought emergency treatment on August 20, 2023, following a seizure that occurred approximately an hour earlier. (Tr. at 935). Pace was alone at the time of the seizure, but a family member found him slumped over on the couch. (Tr. at 937). Pace denied any symptoms following the event other than lightheadedness. (Tr. at 935). A CT scan again showed no acute intracranial findings, and Pace was discharged the same day with instructions to schedule an appointment with his neurologist as soon as possible. (Tr. at 941, 945). Pace followed up with Dr. Shihabuddin on September 18, 2023. (Tr. at 1005). One of his medications was increased, and a repeat MRI was ordered. (Tr. at 1008).

On December 15, 2023, another MRI revealed no acute intracranial findings; normal

appearance of bilateral mesial temporal lobes; and scattered periventricular and subcortical T2/FLAIR hyperintensities that likely represent chronic microangiopathic changes. (Tr. at 994–95). On January 25, 2024, Dr. Shihabuddin provided a medical assessment, noting that Pace had limited balance and should never climb. (Tr. at 919–20). Dr. Shihabuddin stated that Pace's ability to stand, walk, sit, lift, and carry were not affected by his impairment. *Id*. However, Dr. Shihabuddin also stated that Pace had a seizure disorder not fully controlled and "should avoid extreme physical stress as this could provoke seizures." (Tr. at 920).

### C. Pace's Arguments on Appeal

Pace contends that the RFC fails to provide sufficient limitations to account for his severe seizure impairment. (Doc. 7 at 1). Specifically, he asserts (1) that the RFC did not account for postictal symptoms following a seizure, *id*. at 4–12; (2) that the ALJ failed to evaluate adequately and consider the medical opinion of Dr. Shihabuddin, Pace's treating neurologist, *id*. at 12–19; and (3) that the ALJ neglected to provide a narrative discussion of how the evidence supported the RFC, *id*. at 19–20. Because substantial evidence in the record supports the RFC determination, the Commissioner's decision should be affirmed.

A claimant bears the burden of proof to establish his RFC, *Despain v. Berryhill*, 926 F.3d 1024, 1027 (8th Cir. 2019), which is "the most [he] can still do despite [his] limitations," 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). An ALJ must review all the relevant medical and other evidence when determining a claimant's RFC. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). Further, an ALJ is not required to include limitations that are not supported by the evidence in the record. *McGeorge v. Barnhart*, 321 F.3d 766, 769

7

(8th Cir. 2003). Where substantial evidence in the record supports the decision, this Court will not reverse simply because it could have decided the case differently. *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) ("We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice." (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008))).

### 1. The ALJ considered Pace's postictal symptoms.

Pace first argues that the ALJ failed to consider Pace's postictal symptoms—e.g., confusion, lethargy, and disorientation—following a seizure, which Pace maintains would greatly impact his time off task and ability to work. He alleges that he is nonfunctional for a considerable period after a seizure and that the ALJ disregarded this evidence without explanation. As support, Pace cites an April 2022 seizure questionnaire, wherein he stated that it took him two to three days to resume normal activity following a seizure. (Tr. at 245). He also refers to medical notes, reflecting that he exhibited confusion, disorientation, and lethargy in the hours following a seizure. (Tr. at 351, 363, 379–80). Pace argues that the ALJ ignored the effect of postictal symptoms when developing the RFC and failed to offer a reason for rejecting Pace's contention.

"When evaluating a claimant's subjective complaints of pain, the ALJ must consider objective medical evidence, the claimant's work history, and other evidence relating to (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) the claimant's functional restrictions." *Schwandt v. Berryhill*, 926 F.3d 1004, 1012 (8th Cir. 2019) (citations omitted). "But an ALJ need not explicitly discuss

8

each factor," and he "may decline to credit a claimant's subjective complaints if the evidence as a whole is inconsistent with the claimant's testimony." *Id.* (cleaned up).

Although Pace alleges that he needs two to three days to recover following a seizure episode due to postictal symptoms, the ALJ found the evidence did not support limitations to that extent. The ALJ noted first the infrequency of Pace's seizures. (Tr. at 45). From August 2020 through August 2023, Pace had four separate seizure episodes—in August 2020, in November 2020, in January 2022, and in August 2023—and one self-reported episode of shaking with confusion in March 2023. While the ALJ noted that Pace was postictal and presented with confusion, memory loss, and somnolence following his November 2020 seizure episode, the ALJ observed that, following the January 2022 seizure, which lasted less than a minute, Pace was not in acute distress or respiratory distress; he had no focal neurological deficit; and he had no gross motor or sensory deficits. (Tr. at 44). Similarly, the ALJ noted that, following Pace's August 2023 seizure episode, medical notes established that he was alert, had intact fine touch, normal gait, 5/5 strength, and no dysmetria. (Tr. at 45).

In evaluating the effect of Pace's seizures on his ability to work, the ALJ found "infrequent tonic-clonic seizures with treatment, inconsistent with disabling limitations . . . unremarkable examinations indicating the claimant is alert, awake, in no acute distress, with no respiratory symptoms, normal range of motion, 5/5 strength, no dysmetria, no involuntary movements, intermittent sensory deficits, no deficits in balance or coordination, and a normal gait." (Tr. at 45). The ALJ noted a conservative course of treatment and few limitations in Pace's activities of daily living. (Tr. at 45–46).

Despite Pace's allegation otherwise, the ALJ properly considered Pace's claim that he needed multiple days to recover from a seizure. The ALJ found that other evidence in the record, including the medical observations following Pace's seizure episodes and the infrequency of his seizures, contradicted Pace's claim for additional RFC limitations to address postictal symptoms. Where an ALJ seriously considers, but for good reason explicitly discredits, a Plaintiff's subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001); *see also Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." (citing *Russell v. Sullivan,* 950 F.2d 542, 545 (8th Cir. 1991))). The ALJ provided good reasons for rejecting Pace's claims regarding his postictal symptoms, which included infrequency of seizures and a lack of evidence of lengthy postictal symptoms. Even still, the ALJ included sufficient limitations in the RFC to address Pace's postictal symptoms. The Court finds no error.

### 2. The ALJ properly assessed the medical-opinion evidence, including the opinion of Dr. Shihabudddin.

Pace next argues that the ALJ improperly rejected the opinion of Pace's treating neurologist, Dr. Bashir Shihabuddin. Pace claims that the ALJ mischaracterized Dr. Shihabuddin's assessment regarding exertional limitations and rejected the neurologist's opinion without explanation as required by 20 C.F.R. § 416.920c(a). Pace ultimately asserts that light-duty work is too strenuous an exertional load considering Pace's seizure impairment, and Pace proposes that the ALJ should have limited him to sedentary work.

The Administration promulgated new regulations—effective March 27, 2017—governing how ALJs assess medical opinion evidence. The new rules provide that an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)," 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (2017). Instead, ALJs are required to analyze whether opinion evidence is persuasive, based on: (1) supportability; (2) consistency with the evidence; (3) relationship with the claimant [which includes: (i) length of treatment relationship; (ii) frequency of examinations; (iii) purpose of the treatment relationship; (iv) extent of the treatment relationship; and (v) examining relationship]; (4) provider specialization; and (5) any other important factors. 20 C.F.R. §§ 404.1520c(c), 416.920c(c). An opinion is "more persuasive if it is supported by explanation and relevant objective medical evidence, and is consistent with other evidence in record," *Norwood v. Kijakazi*, No. 21-3560, 2022 WL 1740785, at *1 (8th Cir. May 31, 2022) (per curiam) (citing 20 C.F.R. §§ 404.1520c(c), 416.920c(c)). An ALJ must give good reasons for his findings about an opinion's persuasiveness. *Phillips v. Saul*, No 1:19-CV-34-BD, 2020 WL 3451519, at *2 (E.D. Ark. June 24, 2020) (citing Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 FR 5844-01, at 5854, 5858 (Jan. 18, 2017), & Articulation Requirements for Medical Opinions and Prior Administrative Medical Findings – Claims filed on or after March 27, 2017, SSA POMS DI 24503.030).

Pace's argument that the ALJ erred in considering Dr. Shihabuddin's medical opinion is without merit. Although Dr. Shihabuddin recommended certain postural and environmental limitations to accommodate Pace's seizure impairment, Dr. Shihabuddin did not place *any* limitations on Pace's ability to stand, walk, sit, lift, or carry. (Tr. at 919–

20). The ALJ found Dr. Shihabuddin's opinion unpersuasive because it did not go far enough regarding exertional limitations. (Tr. at 46). To accommodate Pace's seizure impairment, the ALJ limited Pace to light work[3] with postural and environmental limitations in line with those recommended by Dr. Shihabuddin. (Tr. at 47).

In addition, the RFC outlined by the ALJ is consistent with the evaluations of two state agency consultants who found Pace could perform light work,[4] which the ALJ found generally persuasive. (Tr. at 46). The ALJ further cited to medical records reflecting Pace's infrequent seizures, diabetes, and obstructive sleep apnea, which the ALJ determined warranted a limitation to light work.[5] (Tr. at 46–47). Although Pace argues that the ALJ misinterpreted Dr. Shihabuddin's opinion—which Pace now claims limited his cumulative amount of physical stress to mitigate his risk of seizures—Dr. Shihabuddin did not explicitly address the cumulative effect of physical stress. Rather, Dr. Shihabuddin stated only that Pace should avoid extreme physical stress. (Tr. at 920). The neurologist's use of the term "extreme" indicates that Pace could sustain normal amounts of physical stress (such as light work), especially considering that, in the same assessment, Dr. Shihabuddin

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567, 416.967(b).

[4] On January 10, 2023, Dr. Jim Takach reviewed the evidence of record and found that Pace could perform light work, including his past relevant work, with some postural and environmental limitations. (Tr. at 84–85). On May 23, 2023, Dr. William Harrison reviewed the evidence of record on reconsideration and adopted Dr. Takach's initial RFC assessment. (Tr. at 93).

[5] Notably, at the May 2024 hearing before the ALJ, Pace's attorney requested that the ALJ find Pace limited to light, unskilled work, rather than sedentary. (Tr. at 59, 78–79) ("I think we can demonstrate he couldn't do his past relevant work, and he may grid at light" . . . "we're trying to get him light and unskilled").

12

did not limit Pace in walking, standing, sitting, lifting, or carrying.

Nor did the ALJ err by refusing to give weight to Dr. Shihabuddin's opinion that, due to his seizure disorder and accompanying limitations, Pace did not have the capacity for gainful employment. (Tr. at 900.) "A treating physician's opinion that a claimant is not able to return to work involves an issue reserved for the Commissioner and therefore is not the type of medical opinion to which the Commissioner gives controlling weight." *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) (cleaned up); *see also* 20 C.F.R. §§ 404.1520b(c)(3)(i), 416.920b(c)(3)(i) (statements on issues reserved for the Commissioner are inherently neither valuable nor persuasive). As such, it was within the purview of the ALJ—not Pace's treating physician—to make the ultimate determination regarding Pace's disability.

### 3. The ALJ provided a narrative discussion of the evidence.

Finally, Pace asserts that the ALJ failed to provide a narrative discussion of the evidence in evaluating the RFC as required by Social Security Regulation (SSR) 96-8p. As explained above, the ALJ relied on the treatment records, medical opinions, and Pace's statements regarding the impact of his impairments. The ALJ devoted over four pages of his written decision to explaining his reasoning in determining the RFC. There is simply no basis for Pace's argument that the ALJ neglected to provide a narrative discussion.

## IV. CONCLUSION

For the reasons stated above, the Court recommends that the Commissioner's decision be affirmed. Substantial evidence supports the Commissioner's decision that Pace was not disabled.

IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's decision be AFFIRMED.

2. Judgment be entered for the Defendant.

DATED this 4th day of February, 2026.

*Benecia Moore*
UNITED STATES MAGISTRATE JUDGE